UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| VICKIE S. MAGEE, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | Case No. 2:11-CV-025-JD |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| *Commissioner of Social* ) | |
| *Security*, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Claimant Vickie Magee filed a complaint on January 19, 2011, seeking review of the Social Security Administration's final decision granting in part and denying in part her 2007 applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). [DE 1]. Pursuant to a court-ordered briefing schedule [DE 13], Magee filed her opening brief on April 22, 2011. [DE 15]. On July 6, 2011, the Commissioner filed a response. [DE 18]. And on July 19, 2011, Magee filed a reply. [DE 19]. The court has considered the arguments of the parties in light of the evidentiary record, and now remands the case to the Social Security Administration for further proceedings consistent with this opinion.

### I. BACKGROUND[1]

Magee, presently forty-nine years of age, reports a variety of physical and mental impairments. Although her benefits application reflects a disability onset date of January 18, 2006, she attributes her condition to a car accident that occurred on August 3, 2001. She claims she has

---

[1] Docket entries are cited as [DE # at Page #] with one exception. The record filed manually at DE 11 will be cited as [R Page #].

1

been unable to work since the accident due to vision distortion, dizziness, memory loss, depression, exhaustion, neck injury, back injury, migraines, numbness in the hands, and shooting pains down her legs. [DE 15]. Many of Magee's complaints are substantiated, to some extent, by the medical evidence, although it tends to show that the listed symptoms manifested themselves in varying intensity and at different times over a span of several years. The court briefly reviews Magee's medical history and prior proceedings before the Administration before turning to a legal discussion.

**A.    Medical History**

Magee did not seek medical attention immediately after the accident. But she did experience some neck pain, and did not return to her job as an office manager. After about two weeks of worsening pain in her neck and intermittent dizziness [R 249], she sought chiropractic care from Dr. William Hagn, D.C. Dr. Hagn referred Magee for evaluation by a neurosurgeon on September 6, 2001. The neurosurgeon, Dr. Thomas Morrell, M.D., noted that an MRI of the cervical spine revealed some change in the normal cervical lordotic curvature and a C5-C6 disc bulge, but no neurocompromise. [R 249]. A physical examination revealed no further abnormalities beyond some tenderness to palpitation and decreased range of motion for the neck. [R 250].

Magee continued to see both Dr. Morrell and Dr. Hagn for her symptoms over the following months, and on October 18, 2001, Dr. Morrell noted a conversation with the chiropractor in which the two agreed to permit Magee to return to work. [R 247]. Magee did so, but quickly experienced a significant increase in pain and was sent home by her supervisor. [R 246]. Around the same time, several more diagnostic tests – MRIs, ultrasounds, etc. – were performed at Dr. Morrell's recommendation, and discovered no abnormalities in either the brain or cervical region, aside from the C5-C6 bulge previously noted. On December 13, 2001, Dr. Morrell wrote a memorandum to the

file indicating that the patient planned to move to Indiana in the near future. He recommended that she continue her course of treatment there. [R 245]. Claimant reports also visiting a Dr. Drobnic before her move north, but his office has no records of her as a patient. [R 384].

Once in Indiana, the claimant visited a new chiropractor, Dr. Marlowe Reynolds, D.C., until October 3, 2003, when Magee concluded that the chiropractor's methods had stopped showing improvement. Around the same time, Magee started seeing Dr. Richard Cristea, M.D., a neurologist, and filed her first application for SSI and DIB. In May of 2004, Dr. Cristea opined to the lawyer representing Magee during the proceedings on her first application for benefits that Magee suffered from a myofascial pain syndrome ("MPS") related to the C5-C6 disc bulge, and was effectively disabled. [R 354]. He recorded secondary diagnoses of greater occipital neuralgia, possible cervical radiculopathy, a history of vestibulopathy, axial low back pain related to the MPS, and persistent visual changes as a result of her pain. [R 354]. Dr. Reynolds, too, wrote to express the opinion that Magee was disabled, remarking that she had "difficulty sitting, walking, and standing for any period of time." [R 531].

From 2003 to 2005, while Magee's first Social Security proceedings were being processed by the administration, Dr. Cristea referred the claimant out to several different specialists to further explore and treat the conditions he perceived. He referred her to an opthalmologist to address her complaints of blurred vision, and with myopic astigmative corrective lenses, Magee's vision was correctable to 20/15 in the right eye and 20/16 in the left eye. The opthalmologist noted that Magee was able to walk well and showed no signs of instability of gaze. [R 264-270; R 351-353]. Dr. Cristea also referred Magee to two internal medicine specialists, Drs. Patel and Uddin, M.Ds., each of whom prescribed medications for pain and inflammation. Dr. Uddin identified a myofascial

3

component to Magee's neck and shoulder pain, and, like Dr. Cristea, tied those conditions to the disc bulge at C5-C6. [R 335]. Additionally, he noted a "psychological component" to Magee's suffering. [R 335].

While she was being seen by the internal medicine specialists, Dr. Cristea also referred Magee out to Integrated Therapy Practice ("ITP") for physical therapy. ITP were the first to notice signs of mechanical dysfunction, not just in the cervical region, but in the pelvic girdle, and particularly the sacroiliac joint. [R 337]. Still, despite the uptick in doctor's visits and diagnoses, Magee's physicians noted excellent progress from her combined regime of therapy and medication during this time period. [R 327; R 335].

But Magee's first action for SSI and DIB, filed in 2003, proved unsuccessful, culminating in the denial of her administrative appeal in early 2005. Magee was discouraged, and "gave up," seeking no medical attention related to the impairments in question for a considerable period of time. [DE 15 at 2]. ITP, for example, discharged Magee as a patient in January of 2005 after she was lost to follow-up. [R 337]. In 2006, she visited Dr. Cristea only intermittently, and for more run-of-the-mill health problems like seasonal allergies. [R 472; R 473].

After about two years of medical inactivity, Magee was convinced by friends and relatives to try again for SSI and DIB with a new attorney. She contacted Attorney Kathleen Walsh and filed the applications underlying this case in January of 2007, alleging a disability onset date of January 18, 2006. The filing of a new action was accompanied by a renewed search for diagnostic information, and in the following months Magee received a new eye examination, a psychological examination, a Magnetic Resonance Imaging ("MRI"), and an electromyography ("EMG").

In addition to the cervical abnormalities previously recognized, the new radiographic tests

4

revealed mild lumbar stenosis and findings consistent with mild carpal tunnel syndrome, or cervical radiculopathy, in both upper extremities. Dr. Cristea submitted a letter to Attorney Walsh on July 24, 2007, conveying his impressions based on the claimant's medical history as well as the new series of tests. He diagnosed cervical radiculopathy, lumbar radiculopathy, MPS, and chronic cervicogenic headache. [R 432]. He also opined that these diagnoses were directly related to the car accident in 2001.[R 433-438]. On July 27, 2007, Dr. Cristea completed an "exertional limitations" assessment. [R 488-492]. He concluded that Magee is only able to stand and/or walk for two hours in an eight-hour workday; to sit (with normal breaks) for six hours in an eight-hour workday; and to sit, stand, or walk (with normal breaks) for two hours in an eight-hour workday. [R 488]. He also noted various postural, manipulative, sensory, and environmental limitations, including a sensitivity to prolonged exposure to cold. [R 489-492]. He concluded, again, that the claimant was disabled. [R 489].

Magee's first psychological examination was performed by Dr. Carl Hale, Psy.D., on March 13, 2007. He observed that Magee's "gait was slow and appeared unstable. She ambulated with the assistance of her mother." [R 388]. Dr. Hale administered several mental status examinations, and found no significant problems. He administered a Wechsler Memory Scale - III memory test, and Magee obtained average scores throughout. Dr. Hale concluded that Magee suffered from a pain disorder due to psychological factors and a general medical condition, with anxiety. [R 391]. He ruled out a depressive disorder.

In addition to the preceding physical and psychological assessments, undertaken at the direction of the claimant's attorney, state agency medical and mental health professionals conducted independent examinations. Dr. Fernando Montoya, M.D., completed a physical residual functional

capacity ("RFC") assessment [R 414-421], and Dr. Kenneth Neville, Ph.D., completed a psychiatric review technique [R 397-410] and a mental RFC assessment [R 393-396]. Dr. Montoya opined that the claimant retained adequate functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently. She could stand and/or walk for six hours in an eight-hour workday and could sit for about six hours in an eight-hour workday. She could frequently climb ramps or stairs, occasionally climb ropes or ladders, and occasionally balance, stoop, kneel, crouch or crawl. Dr. Montoya found no manipulative, visual, communicative, or environmental limitations. Dr. Montoya's findings, obviously, conflicted in many ways with those of Dr. Cristea. On the other hand, Dr. Neville's psychological evaluation was largely consistent with that performed by Dr. Hale. He concluded that Magee suffered from pain due to psychological factors and a general medical condition. He opined that Magee's mental and psychological impairments caused mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. [R 393-395].

 Finally, Magee's attorney referred her to Dr. Robert Coyle, Ph.D., for one more psychiatric review. [R 440-445]. Dr. Coyle interviewed the claimant and performed a battery of psychometric testing. He concluded that Magee's condition met, or equaled, two of the impairments listed in Appendix 1 to 20 C.F.R. 404(p): 12.02 (organic mental disorder) and 12.04 (affective disorder). He opined that an organic mental disorder was evidenced by perceptual or thinking disturbances and disturbances in mood. [R 441]. An affective disorder, namely a depressive syndrome, manifested itself in an apathetic attitude, sleep disturbances, decreased energy, and thoughts of suicide. [R 442]. Dr. Coyle determined that these impairments produced marked limitations on activities of daily living, moderate difficulties with social functioning, and marked difficulties in maintaining

concentration, persistence, and pace. [R 444].

The foregoing summarizes all of the pertinent medical evidence submitted to the administration, and to the court for review. Claimant maintains that some documents related to her *first* disability application – the one that ended unsuccessfully in 2005 – were omitted from her case file in *this* application. But the court cannot consider that here. "The correctness of [the administrative law judge's] decision depends on the evidence that was before [her]." *Eads v. Sec'y of the Dep't of Health and Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993) (citing *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 331 (1976); *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963); *Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991)). "[She] cannot be faulted for having failed to weigh evidence never presented to [her.]" *Id*. Magee argues that the evidence in question is totally missing from her case file. If that is true, it was not before the ALJ, just as it is not now before the court, and it has no bearing on the court's review.[2]

**B.     Procedural History**

As previously mentioned, Magee filed her second application for SSI and DIB – the application underlying this action – in January of 2007. She formally alleged a disability onset date of January 18, 2006, but she argued that her disability arose out of and extended back to her motor vehicle accident in 2001. Accordingly, she requested that her earlier benefits application be reopened while the administration considered her new request.

Her claims were initially denied on April 16, 2007, and denied again upon consideration on June 19, 2007. [R 10]. Magee requested a hearing, and on May 15, 2009, she appeared with counsel

---

[2] Of course, the situation might be different if the evidence was newly discovered and was actually presented to the court for a materiality review. *See Eads*, 983 F.2d at 817. But if it was in the file for Magee's first proceedings, it is far from newly discovered. And, in any case, it still has not been presented to the court.

before administrative law judge ("ALJ") Mary Ann Poulose. [R 24-57]. An impartial vocational expert ("VE"), Edward Kojela, was also present. The ALJ took an opening statement from Attorney Walsh, and questioned Magee extensively concerning her medical impairments and their effect on her day-to-day life. Magee recounted her difficulties with driving, laundry, and other activities, and summarized her medication and medical treatment histories. Of note, Magee indicated that she was "prescribed" a cane by Dr. Reynolds, D.C., after moving to Indiana in 2002, but that she only used it for a month. [R 43-44].

After concluding her questioning of the claimant, the ALJ introduced the VE. The ALJ asked the VE if he "had a chance to review the file[,]" and he answered in the affirmative. [R 52]. Next, the ALJ posed a series of increasingly-restrictive hypotheticals:

> ALJ: Alright. I want you to assume a person of the claimant's age, education, work experience, and skill set. And first we're going to limit her to light work with no climbing of ropes or ladders and only occasional stairs, balance, stooping, crouching, crawling, kneeling. No repetitive rotation or flexion of the neck. Only occasional handling of objects in the right hand or fingering by manipulation. Avoiding concentrated exposure to extreme cold and excessive noise. And I think we will limit her to the unskilled work. Would there be any of the claimant's past jobs that a person with these factors could perform?
>
> VE: No, Your Honor.
>
> ALJ: And were there any other jobs in the regional or national economy that a person with these same vocational factors and limitations could perform?
>
> VE: The three classifications of unskilled, light jobs you have clerical, service, manufacturing, a hypothetical individual would be unable to perform any type of clerical occupations due to the fact they [INAUDIBLE] occasionally or fine manipulation. . . She would be unable to perform any type of manufacturing occupations such as a packer and [INAUDIBLE] assemblers. And then there'd be an extremely high erosion of service occupations; however, the hypothetical individual still could perform occupations such as information clerk, in which there'd be 4,800 positions within Northwest Indiana, Chicago Metropolitan Region. That hypothetical individual could perform work as a hostess of which there'll be 7,200 positions whereas an usher which would be 980 occupations. These are unskilled positions,

>           Your Honor, and they're at the light level of physical tolerance, in that they would require the individual to have the ability to stand six out of eight hours throughout the course of the workday, not necessarily utilize their bilateral upper extremities on a repetitive basis.
>
> ALJ:    Alright. And if this person had to use a hand-held assistance device, would that reduce any of those numbers?

[R 53-54 (with light editing of typographical errors)].

The VE's response to the "assistance device" question was partially inaudible and required some follow-up, but he eventually made clear that this additional condition would erode the occupational base for the hypothetical individual to zero. Beyond that, the ALJ asked a hypothetical identical to the first one, but removing the upper-extremity limitations on fingering or manipulation. The VE answered that, in that case, the occupational base would be the same as the one provided in response to the first hypothetical. [R 54-55]. Finally, Magee's attorney inquired whether, if the hypothetical individual "had headaches causing them to take naps two-and-a-half hours today, [that would] impact any of the hypotheticals?" The VE responded that it would have no effect. [R 56]. With that, the ALJ took the matter under advisement and adjourned the hearing.

On June 25, 2009, the ALJ issued a written decision. [R 10-23]. The ALJ refused to reopen or revise the denial of the claimant's first application for benefits because new and material evidence had not been submitted and because the evidence that was considered in making the decision does not clearly show on its face that an error was made. [R 10]. Next, the ALJ applied the standard five-step sequential evaluation process for determining whether an individual is disabled. She determined that Magee had not engaged in substantial gainful activity since January 18, 2006, the alleged onset date (step one) [R 12]; that since the alleged onset date Magee suffered from severe impairments, including a traumatic brain injury (resulting in moderate difficulties with concentration, persistence,

9

and pace), degenerative disc disease in the cervical and lumbar spine, carpal tunnel syndrome greater on the right than on the left, and a myofascial pain syndrome (step two) [R 13]; that Magee did not have any impairments that met or equaled the listings (step three) [R 13-15];[3] and that Magee could no longer perform her former jobs (step four) [R 21].

Turning to step five, the ALJ relied on the hypotheticals she had posed to the VE at the administrative hearing to conclude that, prior to March 13, 2007, Magee could perform other jobs existing in significant numbers in the regional economy and was thus not disabled. But after that date, she could *not* perform such jobs, and she was disabled. Because the date last insured for DIB purposes was December 30, 2006, that meant Magee was not entitled to DIB at all. But she was entitled to SSI beginning on March 13, 2007, and continuing through the present. [R 11; R 23].

On December 8, 2010, the appeals council denied Magee's request for review [R 1-3], making the ALJ's decision the final decision of the Commissioner. *See Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). On January 19, 2011, Magee filed her complaint in this court seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). [DE 1]. The court ordered and received briefing from the parties, and is prepared to decide the case.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow." Here, it appears that the claimant seeks review of two

---

[3] In so finding, the ALJ considered and adequately discounted Dr. Coyle's determination that Magee's impairments met or equaled listings 12.02 and 12.04. [R 13-15; R 20].

decisions: (1) the ALJ's decision not to reopen or revise Magee's prior application for benefits; and (2) the ALJ's decision on Magee's current application for benefits.

This court has no jurisdiction to review the ALJ's decision not to reopen the prior proceedings. In *Califano v. Sanders*, 430 U.S. 99, 97 (1977), the Supreme Court held that "[§ 405(g)] cannot be read to authorize judicial review of alleged abuses of agency discretion in refusing to reopen claims for social security benefits.... [A]n interpretation that would allow a claimant judicial review simply by filing – and being denied – a petition to reopen his claim would frustrate the congressional purpose, plainly evidenced in § 205(g), to impose a 60-day limitation upon judicial review of the Secretary's *final* decision on the *initial* claim for benefits." *Id.* at 107-08 (emphasis added); *see also Bolden for Bolden v. Bowen*, 868 F.2d 916, 918 (7th Cir. 1989). The Seventh Circuit continues to read this language to mean that, "[a]s a general matter . . . federal courts do not have jurisdiction over the SSA's discretionary refusal to reopen a claim because such a refusal is not a 'final decision' within the meaning" of § 405(g). *Lepper v. Barnhart*, 25 Fed.Appx. 433, 435 (7th Cir. 2001) (citing *Sanders*, 430 U.S. 99, 108; *Bolden*, 868 F.2d 916, 918). The final decision on Magee's first benefits claim, which this court *could* have reviewed, was issued in 2005. We are now far more than 60 days past that date, and the court cannot review the ALJ's decision not to reopen those proceedings.

With respect to the ALJ's determination on the *current* proceedings, however, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). This evidence must be

"more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id*. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law, of course, are not entitled to deference. If the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### III.   DISCUSSION

Disability benefits (and supplemental security income) are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-

step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be analyzed in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(ii). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Although many of the ALJ's findings were well-considered and supported by the evidence, this case must be remanded because the Commissioner failed to meet his burden in step five.

Specifically, when determining whether the claimant could perform other work in the community, "the ALJ erred in omitting [Magee's] moderate limitation on concentration, persistence and pace from the hypothetical posed to the VE, even though the ALJ found that such a limitation exists." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Hypothetical questions posed to vocational experts generally must include *all* limitations supported by the medical evidence. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Thus, as the Seventh Circuit explained in *O'Connor-Spinner*, when presenting hypotheticals to a VE for the purpose of determining a claimant's ability to perform other work, the ALJ must orient the VE to the claimant's limitations, and particularly to any credible limitations on the claimant's concentration, persistence, and pace. 627 F.3d at 619-21. The most effective way to do this, obviously, is to include those limitations directly in the hypothetical. *Id.* at 619. The ALJ in this case did not directly include a limitation on concentration, persistence, and pace in the hypotheticals posed to the VE, despite the fact that she later found that such a limitation existed.

True, the Seventh Circuit has stopped short of requiring that an ALJ *always* directly reference a claimant's limitations in concentration, persistence and pace when soliciting VE testimony. But in the absence of direct articulation, the record must indicate that the VE was aware of the limitation and was permitted to testify with consideration of the same. *O'Connor-Spinner*, 627 F.3d at 619-21. For example, the Seventh Circuit has sometimes assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *Id.* (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele*, 290 F.3d at 942; *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health*

*& Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). There is at least some indication in the hearing transcript that the VE had reviewed "the file," although it is unclear whether the file encompassed the claimant's medical history in addition to work history [R 52], and the VE sat in on the hearing where Magee recounted many of her impairments to the ALJ. But, more importantly, this "record-familiarity" exception does not apply where, as here, the ALJ asks a series of increasingly restrictive hypotheticals that tend to focus the VE's attention on the limitations of the hypothetical person, rather than on the limitations of the claimant herself. *Id*. (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

Another exception exists where, although the hypothetical contains no direct reference to the claimant's limitations on concentration, persistence, and pace, it instructs the VE to exclude occupations where the claimant might be exposed to the stressors that *trigger* such limitations. For example, if Magee's moderate limitations on concentration, persistence and pace were caused only by an external stressor, like loud noises, then *O'Connor-Spinner* might not apply if the ALJ's hypothetical said "no loud noises," even though the hypothetical did not explicitly account for the moderate limitations on concentration, persistence and pace. *See, e.g., Johansen v. Barnhart*, 314 F.3d 283 (7th Cir. 2002) (limitation to "repetitive, low-stress work" was sufficient where claimant's moderate limitations on concentration, persistence, and pace resulted from a panic disorder that would not be triggered by such work); *Arnold v. Barnhart*, 473 F.3d 816 (7th Cir. 2007) (limitation to "low-stress" work accounted for difficulties with concentration, persistence, and pace where those difficulties were triggered by stress-induced headaches). But that is not what happened here. Magee's moderate limitations on concentration, persistence, and pace are not triggered solely by an identifiable external stressor. Instead, they appear to be an integral part of her medical impairments.

They are a function of her pain disorder, and the etiology of her pain is internal. Removing certain *external* stressors from her work environment – for example, by limiting her to "light" and "unskilled" work [R 52] – may relieve some of her other symptoms, but there is no indication in the medical evidence that it would have any effect on her problems with concentration, persistence, and pace.

In short, this case is too much like *O'Connor-Spinner* to warrant a different result. As was the case in *O'Connor-Spinner*, "it is not clear whether the hypothetical . . . would cause the VE to eliminate positions that would pose significant barriers to someone with the applicant's . . . problems in concentration, persistence and pace." 627 F.3d at 620. The ALJ found that moderate limitations existed [R 13], and in most such cases, the ALJ should expressly refer to such limitations "in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *Id*. at 621. Nothing in the record makes this case extraordinary, and remand is the appropriate disposition.

### IV.   CONCLUSION

This court cannot review the ALJ's decision not to reopen the prior proceedings. With respect to the proceedings properly under review, the ALJ's hypotheticals to the VE did not account for the claimant's moderate limitations on concentration, persistence, and pace, even though the ALJ found that such limitations existed. Accordingly, the court **REMANDS** the case for proceedings consistent with this opinion.

SO ORDERED.

ENTERED:   March 16, 2012

/s/ JON E. DEGUILIO
Judge
United States District Court